IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

OCT 2 0 2003

| | |
|---|---|
| HUGO DIAZ,<br>    Plaintiff, | )<br>)<br>) |
| v. | )<br>) |
| PRUDENTIAL INSURANCE COMPANY<br>OF AMERICA, | )<br>)<br>) |
|     Defendant. | )<br>) |

Case No. 03 C 2702

**FILED**

OCT 1 0 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## NOTICE OF FILING

TO:  Mark D. DeBofsky
Daley, DeBofsky & Bryant
One North LaSalle Street
Suite 3800
Chicago, Illinois 60602

PLEASE TAKE NOTICE that on October 10, 2003, we caused to be filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, **Defendant's Response To Plaintiff's Local Rule 56.1 Statement**, a copy of which is attached hereto and hereby served upon you.

Respectfully submitted,

PRUDENTIAL INSURANCE COMPANY OF
AMERICA

By: _____
One of its Attorneys

Leonard S. Shifflett (ARDC #2587432)
Brendan O'Connor (ARDC# 6276720)
Keith Allen (ARDC #6271854)
QUARLES & BRADY LLP
500 West Madison, Ste. 3700
Chicago, Illinois 60661-2511
(312) 715-5000

## CERTIFICATE OF SERVICE

I, Leonard S. Shifflett, an attorney, certify that I caused a copy of the foregoing Notice of Filing, together with the documents referred to therein, to be served upon:

> Mark D. DeBofsky
> Daley, DeBofsky & Bryant
> One North LaSalle Street
> Suite 3800
> Chicago, Illinois 60602
> 312-372-5200 – phone
> 312-372-2778 - fax

via Messenger, postage prepaid, this 10th day of October, 2003, before the hour of 5:00 p.m.

FILED

OCT 10 2003

CLERK, U.S. DISTRICT COURT
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HUGO DIAZ, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 2702 |
| | ) | |
| PRUDENTIAL INSURANCE | ) | Judge Norgle |
| COMPANY OF AMERICA, | ) | Magistrate Judge Brown |
| | ) | |
| Defendant. | ) | |

**DOCKETED**

**OCT 2 0 2003**

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT

Defendant, PRUDENTIAL INSURANCE COMPANY OF AMERICA ("Prudential"), by its attorneys Leonard S. Shifflett, Keith E. Allen, and Brendan O'Connor, hereby submits the following response to Plaintiff's Local Rule 56.1 Statement in accordance with Local Rule 56.1(b)(3):

### Jurisdiction and Venue

1.     Plaintiff's claim involves long term disability benefits and is brought pursuant to §502(a)(1)(B) of Employee Retirement Income Security Act (ERISA) of 1974 (29 U.S.C. § 1132(a)(1)(B). Answer ¶ 4.

RESPONSE: Prudential does not dispute this statement.

2.     29 U.S.C. §§1132(e) (1) and 1132(f) grant the District Court jurisdiction over all parties and over the subject matter of this dispute. In addition, this action may be brought pursuant to 28 U.S.C. § 1331. Answer ¶ 1.

RESPONSE: Prudential does not dispute this statement.

3.     Venue is proper in this District.  29 U.S.C. § 1132(e) (2), and 28 U.S.C. § 1391. Answer ¶ 3.

RESPONSE:  Prudential does not dispute this statement.

4.     The ERISA statute, at 29 U.S.C. §1133, provides a mechanism for administrative or internal appeal of benefit denials.   Plaintiff exhausted all mandatory administrative and internal appeals before filing this suit.  Answer ¶ 2.

RESPONSE:  Prudential does not dispute this statement.

### The Parties

5.     Hugo Diaz ("Diaz" or "Plaintiff") is, and was at all times relevant to this proceeding, a resident of Chicago, Illinois, located within the Northern District of Illinois. Answer ¶ 5.

RESPONSE:  Prudential does not dispute this statement.

6.     Diaz was born on March 7, 1950. (R.286).[1]

RESPONSE:  Prudential does not dispute this statement.

7.     Diaz actively worked as a computer programmer analyst at Bank One.  On February 4, 2002, Diaz ceased working due to persistent low back pain associated with degenerative disc disease. (R.283). Diaz has not engaged in any substantial gainful activity since that date.  Complaint ¶ 8.

RESPONSE:  Prudential states that Diaz was employed by Bank One as an Application Development Analyst II. (R.055).  Prudential denies that he ceased working on February 4, 2002 due to persistent low back pain associated with degenerative disc disease.  Rather he ceased working on February 4, 2002 because he underwent a surgical procedure that date referred to as

---

[1] All documents bearing a Bates Stamp designation 001 through 456 were maintained by defendant as part of the claim record relating to this matter. Hereinafter the claim record will be referred as (R.xxx). A complete copy is attached as  Appendix "A."

L5-S1 posterolateral fusion with instrumentation and left iliac crest bone grafting. (R.275). Diaz had been gainfully employed for two years while he had complaints of back pain. (R.275).

8.      As a benefit of Plaintiff's employment, Bank One insured Diaz under a long term disability insurance policy, No. G-56249 ("LTD Plan"), underwritten by Prudential Insurance Company of America (Prudential).   Answer ¶ 6. At all times relevant hereto, the LTD Plan constituted an "employee welfare benefit plan" as defined by 29 U.S.C. §1002(1); and incident to his employment, Diaz received coverage under the Plan as a "participant" defined by 20 U.S.C. §1002(7).  Answer ¶ 7; Complaint Exhibit A.

RESPONSE:  Prudential does not dispute this statement.

### Significant Plan Provisions

9.      Benefits are paid under the LTD Plan upon the expiration of an elimination period of 182 days of continuous disability.  (R. 422).

RESPONSE:  Prudential agrees that benefits are not payable under the LTD Plan until the expiration of an elimination period of 182 days of continuous disability.  However, to receive payments, the participant must continue to be disabled as defined in the LTD Plan. (R.421).

10.      The LTD Plan provides for payment of benefits due to "total disability," which is defined in relevant part as follows:

> Your inability to perform the essential functions of your regular occupation due to
> an injury or illness.  You may be eligible for LTD benefits even if you're able to
> perform some work, as long as you're unable to perform the essential duties of
> your regular occupation and your disability results in an income loss of at least
> 20% due to that illness or injury.

(R.360).

RESPONSE:  Prudential states that the material quoted above is taken from "Bank One 2001 Benefit Options Answer Book and Enrollment Kit" (R.331), and summarizes the definition

of "Total Disability" but only for the first 24 months of continuous disability. (R.360). The

contract defines "Disability" as follows:

> "You are disabled when Prudential determines that:
>
> · you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
>
> · you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.
>
> After 24 months of payments, you are disabled with Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonable fitted by education, training or experience."

(R.421).

11.     LTD benefits are payable at monthly rate of 50% of monthly earnings, less Social

Security disability insurance benefit payments.[2] (R.422, 425).  Under the present circumstances,

Diaz's monthly benefit is approximately $2,953.42[3] and must be paid until Diaz no longer meets

the definition of total disability or reaches age 66.[4]

RESPONSE:  Prudential agrees that LTD benefits are payable at monthly rate of 50% of

monthly earnings as that term is defined in the Contract (R.423), less Social Security disability

insurance benefit payments, and any other deductible sources of income as that term is defined in

the Contract. (R.425).  Prudential disagrees with the statement that Diaz's monthly benefit is

approximately $2,953.42 (or any other amount) because it is not supported by the record or

affidavit.   Furthermore, Diaz's claimed benefits are subject to a 24 month limitation for

---

[2] Monthly earnings are defined as gross monthly income based upon current annual base pay plus eligible paid commissions and production incentives. 423. Diaz's annual salary was $70,882.00, thus his monthly earnings were $5,906.83. (R.290).
[3] As noted below (See: ¶80 *infra.*), Social Security disability insurance benefits were recently awarded; however, the benefit amount has not yet been determined.
[4] The Plan defines the maximum benefit duration to "normal retirement age," which is the retirement age under Social Security where retirement age depends on year of birth. (R.428). Diaz was born in 1950 and under current Social Security regulations his retirement age is 66.

disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms or which, as determined by Prudential, are due in whole or in part to mental illness. (R.429). Self-reported symptoms and mental illness are defined in the Contract and include pain and numbness as self-reported symptoms and depression, anxiety, somatization, substance related disorders, and disorders as mental illness. (R.430).

### *Application for Benefits*

12.     Diaz filed a claim for long term disability benefits on July 22, 2002. (R.270).

RESPONSE: Prudential does not dispute this statement.

13.     In his application, Diaz alleged an onset of disability on February 4, 2002, arising from lower back pain associated with degenerative disc disease. (R.271).

RESPONSE: Prudential does not disagree with this statement.

14.     Diaz's application for benefits listed Dr. Howard An ("Dr. An), and Dr. Sandeep Amin ("Dr. Amin") as the physicians consulted for his condition. (R.271).

RESPONSE: Prudential does not dispute this statement.

15.     On July 22, 2002, Dr. An completed an attending physician's statement ("APS") for Prudential certifying Diaz's disability. (R.267-9).

RESPONSE: Prudential agrees that on July 22, 2002, Dr. An completed an attending physician's statement. (R. 267-9). Prudential disagrees that Dr. An's statement "certified" Diaz's disability within the meaning of the Contract. (R.267-9).

16.     Dr. An diagnosed Plaintiff as suffering from degenerative disc disease, low back pain, and radiculopathy.[5] (R.267).

RESPONSE: Prudential does not dispute this statement.

---

[5] Radiculopathy is a disorder of the spinal nerve roots. *The Stedman's Medical Dictionary* 1503 (27th Edition, 2000) (Hereinafter "Stedman's).

17.     Dr. An reported that significant loss of function occurred in February, 2000, and listed as Diaz's impairments: chronic pain with weakness of the lower extremities. (R.268).

RESPONSE:   Prudential does not dispute this statement.

18.     Dr. An noted Plaintiff remained on narcotic pain medication to control pain and restricted Plaintiff to sitting no more than fifteen minutes, no lifting greater than ten pounds, no repetitive bending, twisting or torque.  (R.268).

RESPONSE:   Prudential does not dispute this statement.

19.     Dr. An certified that Diaz's condition precluded him from working in any job category.[6]  (R.268).

RESPONSE:   Prudential disagrees with this statement as not supported by the record. Dr. An did not certify anything.  Dr. An stated:  "Pt's current status does not permit him to fit into any of these categories -".  Prudential agrees with footnote 6.

### Supporting Medical Evidence

20.     On November 8, 2000, Plaintiff received a lumbar epidural steroid injection under fluoroscopy to relieve pain.[7] (R.118). The operative report noted Plaintiff's long-standing history of lower back pain radiating into the groin. (Id.). The report noted left lateral disk herniation T12-L1 but no significant stenosis, and mild stenosis at L4-L5 with some facet degenerative changes.[8] (Id.). The report indicated Plaintiff had undergone two epidural steroid injections with no significant improvement of his pain.  (Id.).

RESPONSE:   Prudential does not dispute this statement.

---

[6] The Attending Physician Statement lists five possible job categories (plus "other"): sedentary, light, medium, heavy, and very heavy.  Dr. An checked none of these categories. (R.269).
[7] Fluoroscopy is a live x-ray that physicians use to help guide the needle during an epidural injection. www.spine-health.com/topics, last visited 7-15-03.
[8] Stenosis is the narrowing of the spine.  *Stedman's* 1695.

21.     Diaz received another lumbar epidural steroid injection under fluoroscopy on November 22, 2000. (R.108). Dr. Amin noted Diaz's back pain had started in February, 2000. According to Dr. Amin, the earlier lumbar epidural steroid injection provided some improvement but that Diaz continues to require pain medications. (Id.).

RESPONSE:  Prudential does not dispute this statement.

22.     On June 13, 2001, Diaz received a right lumbar facet steroid injection, L3-4-5, L5-S1, and L2-3 under fluoroscopy. (R.098). Dr. Amin's preoperative diagnosis and postoperative diagnosis reflect lumbar facet arthropathy and lumbar radiculopathy.[9]  The Pain Management Assessment Tool indicated that upon arrival at Rush SurgiCenter Diaz reported his pain at level 4, and level 2 upon discharge. (R.099).

RESPONSE:  Prudential does not dispute this statement.

23.  Dr. An noted that Diaz failed to respond to prolonged non-operative treatments for back pain, including therapy, medications and lumbar epidural steroid injections.  (R.275).  In view of Diaz's prolonged back pain with discogenic changes and an annular tear[10] at L5-S1 reveled under a diskogram with CT scan,  Dr. An performed an L5-S1 posterolateral spinal fusion[11] with instrumentation and left iliac[12] crest bone grafting on February 4, 2002.  (Id.).

RESPONSE:  Prudential does not dispute this statement.

---

[9] Lumbar facet arthropathy is a disease affecting the joint and smooth areas of the lumbar spine. *Stedman's* 150, 638.

[10] The annulus is the fibrous ring of the disc structure which surrounds the centrally located soft nucleus of the disc. The nucleus and annulus function together to create a pressurized structure that acts as a shock absorber. The annulus is a ligament and like any ligament in the body can be torn. Tearing of the annulus can produce pain because the annulus has pain fibers within its structure. *American Academy of Orthopaedic Surgeons* (visited Aug. 27, 2003)
http://orthoinfo.aaos.org/fact/thr_report.cfm?thread_id=185&topcategory=spine.

[11] Posterolateral Fusion of the L5-S1 is the joining of the outer-side of the L5-S1 vertebrae. *Stedman's* 720, 1431

[12] Iliac refers to the broad, flaring portion of the hip bone. *Stedman's* 875.

24.     Following the fusion surgery, Dr. An recommended that Diaz maintain a regular diet; continue to wear a brace and electrical stimulation; avoid lifting, bending, twisting, and continue seeing a pain management specialist.   (R.279).

RESPONSE:  Prudential does not dispute this statement.

25.     Diaz returned to Dr. An on February 22, 2002 for his first post-op follow up. (R.216).  Dr. An noted that Diaz continued to have significant pain following surgery despite Durgesic patches and Norco given him by the pain clinic.[13]

RESPONSE:  Prudential does not dispute this statement.

26.     At Diaz's next follow-up visit on March 22, 2002, Dr. An noted Diaz is much improved following surgery, however medications included Zanaflex, Norco, Kadian and Neurontin.[14] (R. 217).

RESPONSE:  Prudential does not dispute this statement.

27.     At his visit on March 29, 2002, Diaz reported increased left groin pain and an increase in right leg pain, anterior thigh and pain in the bottom of his right foot.  (R.209).  Diaz also reported the sensation of hardware movement in his back.   (Id.).   The Norco was discontinued and medication changed to Lortab and Ambien.[15]

RESPONSE:  Prudential does not dispute this statement.

---

[13] Duragesic patches are indicated for the management of chronic pain where patients require continuous opioid analgesia for pain that cannot be managed by lesser means such as acetaminophen-opioid combinations, non-steroidal analgesics, or as-needed short-acting opioids. *Physician's Desk Reference* ("PDR,") 56th ed. 1787. Norco is a synthetic narcotic analgesic indicated for the relief of moderate to moderately severe pain. PDR, 3426.

[14] Zanaflex is a short-acting drug for the management of spasticity (a type of increased muscle tone at rest characterized by increased resistance to passive stretch. *Stedman's* 1662). PDR, 1306. Neurontin is indicated as adjunctive therapy for the treatment of partial seizures. PDR, 2656. Kadian is a form of sustained release morphine sulfate given for the management of moderate to severe pain where an opioid analgesic is indicated for more than a few days. PDR,  1336.

[15] Lortab is a semisynthetic narcotic analgesic similar to codeine indicated for relief of moderate to moderately severe pain. PDR, 3319.  Ambien is indicated for short-term treatment of insomnia. PDR, 3192.

28.     Diaz telephoned Dr. An's office on April 1, 2002 to report increased right leg numbness and difficulty ambulating. (R.209). He also reported increased anxiety. (Id.). Dr. An prescribed Valium, acknowledging that Diaz did have a panic attack prior to surgery.[16] (Id.).

RESPONSE:  Plaintiff stated in the past that he had taken medication for a panic attack before a surgery. (R.209). With this addition, Prudential does not dispute this statement.

29.     Based on Diaz's complaints that the metal fixtures implanted during the spinal fusion were moving, Dr. An reviewed x-rays taken on April 5, 2002 and noted that the fusion was consolidating and the hardware was in place. (R. 207). Dr. An expressed a concern about the amount of pain medication needed and encouraged Diaz to begin physical therapy. (Id.).

RESPONSE:  Prudential does not dispute this statement.

30.     Dr. An wrote to Diaz's employer after Diaz forwarded an earlier memo regarding a verbal warning he received for extensive absences. (R.204-5). Dr. An expressed his hope the organization will be less rigid in Diaz's case. Dr. An then gave a history of Diaz's back pain, noting that while Diaz desired to return to work following such extensive surgery, that the rehab period required physical therapy and pain control. (Id.).

RESPONSE:  Dr. An recites that the warning was dated June 1, 2001. (R.205). With this addition, Prudential does not dispute this statement.

31.     On April 30, 2002, Dr. An certified Diaz's disability at the request of Bank One Disability Management Services, and that a return to work date would be evaluated on May 24, 2002. (R.221-2).

RESPONSE:  Dr. An stated that the current functional limitations preventing Plaintiff from performing his job duties were pain and pain management. (R.221). With this addition, Prudential does not dispute this statement.

---

[16] Valium is prescribed for short-term relief of the symptoms of anxiety. PDR, 3048.

33. On April 30, 2002, Diaz underwent an initial evaluation and treatment at Athletico Sports Medicine and Physical Therapy Center ("Athletico") at the request of Dr. An. (R.253). Melissa Kidder DPT ("Kidder"), assessed Diaz's condition as bilateral lower extremity pain, back pain, decreased range of motion to the lower extremities, and weakness secondary to discogenic back pain. (R.254). Kidder planned a course of physical therapy for Diaz 2-3 times a week for 4-6 weeks. (Id.).

RESPONSE: Melissa Kidder reports that two years prior when patient was lifting furniture he had low back pain with pain bilateral calf and thigh pain. Back pain is rated 4 to 5/10. (R.253). With this addition, Prudential does not dispute this statement.

34. Diaz telephoned Dr. An on May 1, 2002 to report that after his Neurontin was decreased he began experiencing severe bilateral lower extremity pain. (R.206). Dr. An expressed that long term use of Oxycontin was probably a contributing factor in the inability to control Diaz's postoperative pain.[17] (Id.). Diaz reported that he would visit Lake Shore rehabilitation services. (Id.).

RESPONSE: There is no evidence that Plaintiff ever received drug rehabilitation services from Lake Shore or any other provider. With this addition, Prudential does not dispute this statement.

35. Dr. An's notes from May 8, 2002 indicated that after a pain center evaluation that Diaz was experiencing somatoform pain. (R.200). Dr. An noted that he was contacted by Kidder at Athletico to say that Diaz had missed his physical therapy appointment and canceled future appointments due to excessive lower extremity pain. (Id.). Dr. An informed Kidder that he was

---

[17] Oxycontin, an opioid agonist and Schedule II controlled substance with an abuse liability similar to morphine, is a formulation of oxycodone hydrochloride indicated for the management of moderate to severe pain when a continuous analgesic is needed for an extended period of time. PDR, 2912.

attempting to wean Diaz off narcotic medications and would encourage Diaz to continue with physical therapy. (Id.).

RESPONSE: Prudential does not dispute this statement.

36.     Dr. An's treatment notes from May 10, 2002, showed that Diaz has a difficult time going to physical therapy, and difficulty walking long distances. (R.223). Dr. An provided Diaz with physical exercises to perform at home as well as a prescription for Ultracet.[18] (R.224). Dr. An noted improvement in Diaz's condition post-surgery but indicated that he still had residual leg pain radiating into the lower extremities with associated back pain on the left side. (Id.).

RESPONSE: The statement in the first sentence above was based on statements to Dr. An by Plaintiff, not observations by Dr. An. (R.223). Plaintiff also reported that he felt he is going to need help from a psychiatrist for his depression as well as a possible detox program in the future. (R.223). With these additions, Prudential does not dispute this statement.

37.     The radiology report from May 10, 2002 showed satisfactory postoperative appearance of the lower lumbar spine. (R.201).

RESPONSE: Prudential does not dispute this statement.

38.     Kidder updated Dr. An on May 16, 2002 and reported that Diaz had not missed or canceled his scheduled physical therapy appointments. (R.255). Diaz's treatment included moist heat, soft tissue massage, myofascial release, closed kinetic chain exercises, posture re-education, lumbar stabilization, body mechanics training, home program instruction, and

---

[18] Ultracet is a synthetic opioid analgesic combined with acetaminophen, administered for short-term management of acute pain. PDR, 2597.

cryotherapy.[19] Kidder noted that Diaz would stop therapy at Atheletico and continue physical therapy at a more convenient facility. (Id.).

RESPONSE: Prudential does not dispute this statement.

39.  Thereafter, Diaz attempted physical therapy at home; however, the home physical therapist found that there was insufficient equipment to do so. (R.233). Dr. An contacted Kidder to renew physical therapy at Athletico. (Id.).

RESPONSE: Prudential does not dispute this statement.

40.  Kidder reported to Dr. An the results of her physical therapy re-evaluation and assessment of May 24, 2002. (R.231). She confirmed Diaz's decreased flexibility, decreased strength, gait deviations[20], his inability to walk more than 3 blocks, sit more than 45 minutes, lateral calf numbness, and bilateral calf and knee pain. (Id.).

RESPONSE: Prudential disagrees with the second sentence. Plaintiff's inability to walk more than 3 blocks, sit more than 45 minutes, lateral calf numbness, and bilateral calf and knee pain were all based solely on Plaintiff's self-report. (R.231).

41.  At the next follow-up visit to Dr. An on June 4, 2002, treatment notes indicated Diaz had some improvement in his pain level; however, residual back pain and numbness around the left thigh persisted. (R.230). Diaz was instructed to decrease the Kadian and Norco medications and to take Ultracet and Vioxx instead. (Id.). Dr. An renewed Diaz's prescription for Neurontin and additional physical therapy 2-3 times a week for 4 weeks. (R. 232).

RESPONSE: Prudential disagrees with the statement in the first sentence. Dr. An wrote: "His pain is much better than his preoperative status although he has some residual back

---

[19] Cryotherapy is the use of cold in the treatment of a disease. *Stedman's* 432.
[20] Refers to the manner and deviation in Plaintiff's walking. *Stedman's* 722.

pain, particularly on the left side over the bone graft area. He has some numbness around the lateral aspect of the left thigh. He can walk about four blocks and has to rest." (R.230).

42. Diaz telephoned Dr. An on June 6, 2002, complaining of continued severe lower back pain and bilateral lower extremity pain. (R.229). Dr. An encouraged Diaz to wean himself off of Kadian and Norco. (Id.).

RESPONSE: On June 6, 2002, Plaintiff called Dr. An's office to say that he continues to have lower back pain, specifically at the surgical site as well as bilateral lower extremity pain. (R.229). Dr. An explained that the hardware was in place and even if it moved it would not be causing bilateral lower extremity pain. Plaintiff was also told that he probably would have continued pain at the graft site. Plaintiff was encouraged to wean down on the narcotics and to follow through with some psychiatric support which Dr. An had been encouraging since one week after surgery. Plaintiff said he would attempt to fit a psychiatric appointment into his very busy schedule. (R.229). With this addition, Prudential does not dispute this statement.

43. Dr. Amin, at the Rush Pain Center, provided an update to Diaz's primary physician on June 18, 2002. (R.281). Dr. Amin noted that Diaz's pain is constant, occasionally sharp, and wakes him while asleep. Moreover, the pain medications give some relief but not enough. (Id.). Dr. Amin recommended that Diaz may need detoxification since he was chronically dependent on his opiate medication. (Id.).

RESPONSE: Prudential does not dispute this statement. In addition, in an office note of June 26, 2002, Dr. An stated that a review of Plaintiff's prescription medications showed an overlap of pain medications prescribed by Plaintiff's primary care physician and the Paint Center physician. (R.234).

44. Kidder's notes from physical therapy on June 20, 2002 indicated Diaz had increased back pain and was only able to walk 4 blocks. (R.263). Kidder's notes from June 24, 2002 indicated Diaz's back pain is level 7 out of 10.[21] (R.263).

RESPONSE: Pain level is based solely on Plaintiff's self-report. (R.263).

45. Kidder reported to Dr. An on June 27, 2002, affirming Diaz's poor strength in his left lower extremity at L2, L3, L4 myotomes[22] and left anterior and lateral thigh numbness. (R.241). Diaz's lower back pain was constant at a level of 7 out of 10, with constant left lateral and anterior thigh numbness and lower extremity weakness with walking. He could walk 3 to 4 blocks and ascending stairs was very challenging. Diaz could sit only 15 minutes. Dr. An ordered four additional weeks of physical therapy, 2 to 3 times a week. (R.235).

RESPONSE: Kidder's assessment on this visit was that Plaintiff had improved his lower extremity flexibility and right lower extremity strength. Kidder also reported that he would benefit from physical therapy to progress his strengthening. (R.241).

46. On July 18, 2002 Kidder provided another update to Dr. An, at which time Diaz's pain had worsened to a level of 10 out of 10, steadily increasing over the previous 2 weeks. (R. 247). Diaz could walk 4-5 blocks, with increased symptoms after sitting 10-15 minutes and decreasing when in a supine position. (R. 247).

RESPONSE: Kidder's assessment on this visit was that Plaintiff demonstrates improved right myotomal strength, and decreased complaints of lateral left radicular symptoms. (R.247).

47. Diaz returned for a follow up with Dr. An on July 19, 2002. (R.246). Dr. An noted there was significant residual back pain and numbness in the left thigh, and he ordered a

---

[21] Pain is measured on a numerical pain scale from 1 to 10, with 1 at no pain and 10 being the worst possible pain. (R.079).
[22] All muscles derived from one somite and innervated by one segmented spinal nerve is the myotome. *Stedman's* 1177

CT scan to rule out any disk problem above the fusion or hardware migration. (Id.). Dr. An opined that Diaz was not able to work. (Id.). The radiology report from that same day indicated no change has occurred since the prior study. (R.199). Another CT scan of July 31, 2002 showed the hardware from bilateral fusion to be appropriately positioned. (R.197).

RESPONSE: On this visit Dr. An stated: "He did better following surgery with good relief of his back pain. However, his pain is returning somewhat in the middle back." Dr. An also stated, " . . . hopefully in a couple of months he should be able to do some light duty work." (R.246).

48.    Dr. An provided a status report on August 2, 2002 indicating Diaz was unable to resume work pending reevaluation in September. (R.245). Office notes indicated residual back pain, and the need for continued management of pain by the Pain Clinic Center. (R.243). Dr. An considered adding a prescription medical device to improve Diaz's muscular pain, and he predicted Diaz should be able to return to work in one month with some restrictions. (Id.).

RESPONSE: On August 2, 2002, Dr. An state: "He has gotten better since surgery but he still has some residual back pain." (R.243).

49.    On September 3, 2002, Diaz required treatment at the emergency room at Rush Presbyterian St. Lukes Medical Center with lower back pain at the maximum level of severity. (R.166). Diaz entered Rush after his back pain had once again worsened and had become uncontrollable. (R.171).

RESPONSE: On September 3, 2002, Plaintiff presented himself to the emergency room at Rush Presbyterian St. Lukes Medical Center complaining of lower back pain. (R.166). Plaintiff stated that his pain came back 3 months after his surgery. (R.166). In the assessment it was noted that Plaintiff was able to ambulate normally. Plaintiff reported the pain site as lower

back. Plaintiff state that for the last several days pain has been becoming worse in severity and uncontrollable. Plaintiff reported the pain as stabbing and pain is non-radiating. (R.171). Plaintiff was given an extensive physical exam which reported all normal responses. (R.167-168). In particular each aspect of his neuro exam was reported as normal, gait normal. (R.168). He was administered 60 mg of Toradol and 4 mg of morphine. (R.163). He was given a prescription for 20 Ultram – 50 mg tablets and 20 Norco 325 mg tablets. (R.165). He was discharged to home after a few hours. (R.170).

50. On September 5, 2002, Kidder reported Diaz's pain was at 9/10, and that he had difficulty in sitting. Kidder noted Diaz's decreased left lower extremity strength, diminished left L3-4 and right S1, dural irritation with bilateral femoral nerve and SLR and Diaz's continued complaints of constant severe lumbar pain and left anterior thigh numbness.[23] (R.161).

RESPONSE: Kidder noted that "Patient rates pan at 9/10." (R.161).

51. Dr. An's treatment notes, dated September 6, 2002, show that Diaz returned for a visit because of uncontrollable back pain. (R.177). Pain resided in the L3-4 region into the paraspinal areas. His pain was constant and worsened with standing, bending and sitting. (Id.). Dr. An noted that Diaz remains disabled because of ongoing symptoms of back pain. Radiology from that same day showed no new abnormalities. (R. 178).

RESPONSE: Dr. An's note states: "He is having significant low back pain in recent weeks which is uncontrollable according to the patient." (R.177). Dr. An also stated: "I will see him again in three months and hopefully his condition will improve at that time so that he may

---

[23] SLR, or straight leg raising test is a sciatic nerve tension test indicating irritation of the lumbosacral nerve roots, commonly seen in individuals with a herniated lumbar disk. *Guides to the Evaluation of Permanent Impairments ("Guides")*, §15.1a, 5th ed. 2001.

return to work. As far as pain medication and management is concerned, I will leave this up to the pain management center." (R.177).

52. Dr. An's wrote on September 19, 2002, that Diaz had "been off work since February 4, 2002 and remained disabled." (R. 082).

RESPONSE: Prudential does not dispute this statement.

53. On October 29, 2002, Dr. An completed a form assessing Diaz's "Ability To Do Work Related Activities." Dr. An's reported severe restrictions in Diaz's ability to lift and carry weights less than 10 pounds, that Diaz can only stand for 15 minutes at a time, must walk for five minutes every 15 minutes, needs to able to change positions at will, and that he can only occasionally twist, stoop and crouch and can never climb ladders. (R 151-2; 158).

RESPONSE: The form had only determined range of responses available for the physician. (R.151-2). Prudential believes this is a standard form prepared by Plaintiff's counsel to challenge disallowance of disability benefits.

54. On November 6, 2002, Kidder again reported to Dr. An that Diaz had minimal changes in his condition. Pain fluctuated from 7-9.5/10, and he could walk for 10-11 blocks, although sitting for more than 15 minutes was painful and standing for more than 20 minutes caused pain. While Diaz demonstrated improved myotomal strength, his core strength was poor secondary to difficult in tolerating progression of therapeutic exercises. Diaz's treatment included aquatherapy, deep tissue massage for thirty minutes twice a week and land physical therapy once a week. (R. 153).

RESPONSE: Pain level and time for sitting or standing without pain were self-reported by Plaintiff. (R.153).

55.   Dr. An's treatment notes, dated November 15, 2002, verify Diaz's chronic low back pain. Dr. An requested the Pain Center change or increase Diaz's medications at that point. (R. 068).

RESPONSE: Dr. An stated a diagnosis of chronic low back pain. He did not "verify" it. (R.068).

56.   Progress notes from the Rush Pain Center on November 12, 2002 denote that Diaz's pain was unimproved. Diaz received trigger point injections with little to no relief. Diaz's pain was assessed at 10 and Diaz complained of constant deep pain that was getting worse. Diaz received a prescription for Topamax. [24] (R.079).

RESPONSE: Prudential does not dispute this statement.

57.   On November 19, 2002, Diaz was treated again by Dr. Amin at the Rush Pain Center. Progress notes indicated complaints of increased pain. Medications listed include Norco, Vioxx, Topamax, Zanaflex, Remeron, and Duragesic Patch.[25] (R.080). Dr. Amin prescribed Toradol,[26] and performed an epidural steroid injection. [27] (R.156).

RESPONSE: Prudential disagrees that an epidural steroid injection was administered on November 19, 2002. On that date, that procedure was scheduled for November 22, 2002. (R.156).

58.   Seeking to relieve Diaz ongoing pain, on November 22, 2002, Dr. Amin performed another lumbar epidural steroid injection under fluoroscopy. (R.073). Similar injections were performed again on December 19, 2002 and January 2, 2003. (R.014; 074, 078).

---

[24] Topamax is indicated for adjunctive therapy for adults with partial onset seizures. PDR, 2590.
[25] Zanaflex is prescribed for management of spasticity. PDR, 1306. Remeron is prescribed for depression. PDR, 2483.
[26] Toradol is used for the management of moderately severe acute pain that requires analgesia at the opioid level , usually in a postoperative setting. PDR, 3018.
[27] An epidural steroid injection is an injection of steroids into the inflamed area of the spine to help reduce the pain. www.spine-health.com/topics, last visited 7-15-03.

RESPONSE: In the Operative Report for December 19, 2002, Dr. Amin noted that following the first lumbar epidural steroid injection on November 22, 2002, there was significant improvement of pain (R.074). On January 2, 2003, Plaintiff received a caudal epidural steroid injection with fluoroscopy. (R.014).

59. Dr. An renewed the prescription for Duragesic Patch on December 19, 2002, and Dr. Amin renewed the prescription for Ultram.[28] (R. 069).

RESPONSE: Prudential does not dispute this statement.

60. Progress notes from Rush Pain Center, January 14, 2003, reported Diaz continued to experience constant pain, that he received no relief from the last two injections and he was unable to sleep for long periods of time as the pain wakes him from sleep. (R.061). Dr. Amin renewed prescriptions for Fentanyl Patch, and Ultram.[29] (R.144).

RESPONSE: The progress notes are based on Plaintiff's self-reports. These notes also state he reports numbness and now pain in left thigh. (R.061).

61. Dr. An's treatment notes from January 24, 2003, explained Diaz suffers from significant tenderness with palpation to light touch around the incision area. Treatment notes also reference Diaz's complaints of lower lumbar pain occasionally radiating into his leg. (R. 059).

RESPONSE: These observations are based on Plaintiff's self-reports. (R.059).

62. Dr. An's treatment notes of February 25, 2003, corroborated Diaz's persistent back pain following the lumbar fusion in February 2002. Although Dr. An opines the surgical fusion went well he noted that Diaz's pain was "persistent". Dr. An posits that Diaz's pain comes from multiple sources including muscles, scar tissue and soft tissue around the surgical

---

[28] Ultram is indicated for the management of moderately severe pain. PDR, 2600.
[29] Fentanyl is the generic form of Duragesic, see fn. 10

area. He noted that Diaz's range of motion was significantly decreased. Dr. An believed that Diaz was significantly impaired and unable to return to work. (R.044).

RESPONSE: Prudential disagrees that Dr. An "corroborated" Plaintiff's persistent back pain. Dr. An merely noted what Plaintiff self-reported. (R.044).

63. Rush Pain center progress notes from February 26, 2003, indicate Diaz continued to report low back pain radiating down his leg. (R.039). Medications included Duragesic, Ultram, and Celebrex.[30]

RESPONSE: Prudential does not dispute this statement.

64. On March 11, 2003, Diaz was again seen by Dr. Amin at Rush Pain Center. Progress notes support lumbar radiculopathy. The attending physician increased the Duragesic patch two weeks prior and Diaz is somewhat better. Diaz's activity level continued to decrease; and the pain increased -- he was experiencing pain at a level 10. Diaz's pain initiates in the center of his back and radiates into his thigh. (R. 041). Prescriptions for Duragesic, Ultram, Celebrex were renewed and Effexor was added to his medication regimen.[31] (R.042).

RESPONSE: Prudential disagrees that the "Progress notes support lumbar radiculopathy." Lumbar radiculopathy is a listed diagnosis. (R.041).

65. Dr. Amin's progress notes of April 8, 2003, reflect pain was continuing to radiate into the left thigh and that Diaz suffered increased pain upon lying down. (R.037). Diaz's medications included Duragesic, Ultram, Celebrex, and Effexor.[32] (R.042).

RESPONSE: The progress notes of April 8, 2003 indicate a decrease in pain and an overall improvement of 20% since treatment began. (R.037).

---

[30] Celebrex is a nonsteroidal anti-inflammatory drug for the relief of osteoarthritis and rheumatoid arthritis. PDR, 2676.

[31] Effexor is prescribed for the treatment of depression. PDR, 3495.

[32] Celebrex is used for relief of the signs and symptoms of osteoarthritis and rheumatoid arthritis. PDR, 2676.

66.     According to treatment notes of April 30, 2003, Diaz's range of motion remained significantly restricted with flexion of only 20 degrees, extension of 5 degrees and lateral bending of 15 degrees.[33]  (Exhibit "B").  Additionally, it was noted that Diaz had an abnormal mammogram on the left breast.  (Id.).  Dr. An noted that continued pain management and home exercise were recommended; no further surgery was recommended or planned.   Dr. An expressed the opinion that Diaz's condition is significantly disabling and he is unable to return to work.  (Id.).

RESPONSE:  This information was not submitted to Prudential and therefore was not considered by Prudential in its benefits determination process.

67.     Rush Pain Center progress notes from May 6, 2003 established Diaz's lumbar radiculopathy.  Diaz's pain was reported at is a 10 out of 10. (Exhibit "C").  Diaz was given prescriptions for Duragesic Patch, Ultram, and Paxil. [34]

RESPONSE:  This information was not submitted to Prudential and therefore was not considered by Prudential in its benefits determination process.  Prudential disagrees that this note "established Diaz's lumbar radiculopathy."  This is merely a stated diagnosis.

68.     Progress notes from June 3, 2003 Rush Pain Center reported Diaz's pain is 9 out of 10 and no improvement in Diaz's condition.  Diaz received a prescription for Methadone. [35] (Exhibit "D").

---

[33] Spinal impairment rating is performed using either the diagnosis-related estimate (DRE) or range-of-motion method (ROM).  The DRE method is principally used to evaluate an individual who has had a distinct injury, while the range-of-motion method is used where an impairment is not caused by an injury, as is the case here.  An impairment rating based on loss of motion is obtained by combining the ratings from all three measurements.  A flexion measurement of 45 degrees reflects 0% impairment of the whole person, whereas 0-29 degrees reflects 5-11% impairment of the whole person.  An extension from neutral position of 25 degrees represents 0% impairment while 0 degrees represents 7% impairment of the whole person.  Lateral bending from neutral of 25 degrees represents 0% impairment while 0 degrees represents 5% impairment of the whole person.  Guides §§15.8, 15.9.

[34] Paxil is an anti-depressant. PDR, 1609.

RESPONSE: This information was not submitted to Prudential and therefore was not considered by Prudential in its benefits determination process. Prudential disagrees with the conclusion in footnote 15 that Methadone was prescribed for relief of severe pain. From the progress note, one cannot tell why the change was made or if it was made for more than one reason (Exhibit "D").

69. A Rush Pain Center progress note dated June 10, 2003 reported that Diaz's pain is 10 out of 10, and that pain control was inadequate with the current dosage of methadone. (Exhibit "E").

RESPONSE: This information was not submitted to Prudential and therefore was not considered by Prudential in its benefits determination process. Methadone dosage was increased.

70. Pain Center progress letter of June 17, 2003 showed a pain level of 7 out of 10 with the worst pain triggered by sitting or lying down. (Exhibit "F").

RESPONSE: This information was not submitted to Prudential and therefore was not considered by Prudential in its benefits determination process. Plaintiff reports that since last visit he feels better. (Exhibit "F").

71. On June 27, 2003 Diaz was seen by neurologist Jeffrey Kramer, M.D.S.C. for a consultation. Dr. Kramer's impression was that Diaz experienced "failed back syndrome with chronic pain" (Exhibit "G"). Dr. Kramer recommended a Spinal Cord Stimulator.

RESPONSE: This information was not submitted to Prudential and therefore was not considered by Prudential in its benefits determination process.

### *Benefit Determination*

---

[35] Methadone may be prescribed for relief of severe pain, detoxification treatment of narcotic addiction, or for temporary maintenance treatment of narcotic addiction. PDR, 3056. In Diaz's case, it appears from treatment notes that Methadone was prescribed for relief of severe pain.

72. On August 27, 2002 Prudential denied Diaz's application for long term disability benefits.[36] (Exhibit "H"). Prudential noted that Diaz had been treated by Dr. An, Dr. Amin and Athletico Physical Therapy; however, Prudential based its decision on a review of medical records from Dr. An and Athletico Physical Therapy and not Dr. Amin. The review included hospital records and office from April 23, 2002, May 10, 2002, June 4, 2002 and a CT scan performed July 31, 2002. In addition, Prudential noted that Diaz began treatment on May 31, 2002 at Shore Rehab due to its impression that Diaz had somatoform pain. Prudential asserted that the available medical evidence does not support Diaz's reported inability to perform his own sedentary occupation. Prudential found no basis for an impairment prior to August 5, 2002; the date when LTD benefits would have begun.

RESPONSE: In addition to the matters stated above, the August 27, 2002 letter stated:

"The process followed in reviewing your claim involved the following:

- Obtaining and reviewing information regarding the medical condition that you feel prevents you from working.

- Obtaining and reviewing information regarding your daily activities.

- Obtaining and reviewing information regarding your occupation."

(Exhibit "H", p.1)

73. On October 22, 2002, Prudential received Diaz's request for review. (R.312). On November 22, 2002, Diaz submitted additional medial records supporting his disability. (R.148-178). The submitted records included the Medical Opinion Re: Ability To Do Work-Related Activities (Physical) form, completed by Dr. An. (R.151,152,158). Also included was a progress update from Kidder indicating Diaz's pain level was fluctuating from 7-9.5. (R.153-4). Dr. An opined on September 6, 2002, that Diaz "remains disabled because of ongoing symptoms of back

---

[36] While Prudential's denial letter is not to be found in the claim file, it is obviously a part of the record as it represents Prudential's claim determination.

pain." (R.177). From the foregoing evidence, Diaz argued that he could not return to his regular occupation due to high levels of pain which interfered with his ability to sit, stand, maintain attention and concentration, and precluded his ability to work over the course of a regular work day or work week. (R.148).

RESPONSE: The Medical Opinion Re: Ability To Do work-Related Activities (Physical) form is Plaintiff's attorney's form that has pre-determined range of responses for selection. (R.151, 152, 158). Plaintiff's attorney's conclusory agreement is not a relevant fact for summary judgment purposes.

74. On January 22, 2003 Prudential denied Diaz's request for reconsideration of its decision to deny benefits. (R.311-13).

RESPONSE: Prudential disagrees with the statement. Prudential did reconsider Plaintiff's claim. Upon reconsideration, Prudential upheld the disallowance of the claim. (R.313). In Prudential's letter of January 22, 2003, a detailed review of the medical documentation was made with Prudential's medical consultants and relevant notations were commented on. Prudential then concluded as follows:

> "The medical records from Mr. Diaz' physicians indicate that he is healing well post operatively and that his level of activity is consistent with sedentary duties. Further, you indicate that Mr. Diaz' use of narcotic pain medications affect his ability to work. Our review of the records indicates that Mr. Diaz was taking narcotic pain medication for over two years. during this time, Mr. Diaz was able to continue working . . .The medical documentation does not reveal a sickness or injury that would prevent Mr. Diaz from performing sedentary duties."

(R.312).

75. On February 4, 2003, Diaz appealed Prudential's denial through counsel, calling to Prudential's attention that not all of the evidence previously submitted by Diaz had been reviewed, in particular the evidence that showed Diaz was under the care of Dr. Amin for pain

management. (R.127). Dr. Amin's records, submitted with the appeal, supported that despite epidural steroid injections, Diaz suffered from constant, unremitting pain without relief and would not be able to return to work. (R.145;156). On March 4, 2003 Prudential acknowledged its receipt of Diaz's request for reconsideration of his claim for long-term disability benefits submitted by counsel. (R.315).

RESPONSE: Prudential's letter of January 22, 2003 did state that the review of Plaintiff's claim included medical information from Dr. An, Orthopedic Surgeon, and Dr. Amin, Pain Management. (R.312). Dr. Amin's records did not state that Plaintiff would not be able to return to work. (R.145; 156). R.145 appears to be by Dr. An.

76.     On March 25, 2003, Prudential submitted medical documentation to Gale Brown, Jr., M.D., a physician frequently hired by Prudential, requesting comment on any medically-determinable impairment that would significantly restrict Diaz's function related to working at a sedentary occupation. (R.316).

RESPONSE:  Plaintiff fails to support his statement that Dr. Brown is "frequently hired by Prudential."

77.     On April 3, 2002, Dr. Brown reviewed the medical evidence submitted and stated Diaz's ongoing symptoms of persistent and disabling pain were not supported by the clinical and diagnostic evidence. (R.033).

RESPONSE: Dr. Brown was also of the opinion that the clinical and diagnostic evidence does not support musculoskeletal or neurological impairment that would preclude Plaintiff from performing the essential duties of his own sedentary occupation on a full time basis, with allowance for position change. Dr. Brown noted that Plaintiff's occupation does not require heavy lifting, or highly repetitive bending and twisting. (R.034).

78. On April 16, 2003, Prudential denied Diaz's final request for reconsideration. (R.318-20). Prudential noted that while Diaz continued to experience back pain, this did not support an impairment that would prevent sedentary duties. Prudential determined that Diaz was capable of performing the duties of a sedentary occupation. (R.320).

RESPONSE: Prudential does not dispute this statement.

79. Following the denial of the final appeal, Diaz filed suit on April 22, 2003 in federal court and was served through the State of Illinois Department of Insurance. (R.323-408).

RESPONSE: Prudential does not dispute this statement.

### *Social Security Determination*

80. On July 24, 2003, the Social Security Administration ("SSA") issued its fully favorable decision finding Diaz disabled since February 4, 2002 under section 1614(a)(3)(A) of the Social Security Act. (Exhibit "I").

RESPONSE: The SSA determination is not relevant in this case. See, Black & Decker Disability Plan v. Nord, ____ U.S. ____, 123 S.Ct. 1965, 115 L.Ed.2d 1034 (2003).

81. The SSA determined that Diaz medically determinable impairment of degenerative disease of the lumbar spine, following L5-S1 fusion, significantly limits his ability to perform basic work activities. (Exhibit "I", p. 6).

RESPONSE: The SSA determination is not relevant in this case. Black & Decker Disability Plan v. Nord, supra. The conclusion is factually disputed by Prudential (R.030-035).

### *Benefits Due*

82. Diaz is entitled to benefits beginning after the conclusion of the 182 day elimination period or from August 5, 2002. (R.422).

RESPONSE: Prudential disagrees with this conclusion (R.030-035).

83.     Diaz is entitled to monthly benefits owed of $2,953.42 commencing August 5, 2002, offset by monthly SSDIB benefits, and continuing through the present date, plus 9% interest in accordance with 215 ILCS 5/357.9.

RESPONSE:  Prudential disagrees with this statement because it is not supported by the record.

84.  Diaz is entitled to continued monthly benefits totaling approximately until Diaz is no longer eligible which may continue until Diaz reaches age 66 on March 7, 2016.

RESPONSE:  Prudential disagrees with this statement because Plaintiff is not entitled to LTD Benefits under the Plan.  Responding further, the maximum limit of benefits based on pain and/or mental illness is twenty-four months. (R.429).

Respectfully Submitted,

PRUDENTIAL INSURANCE COMPANY OF AMERICA

By: _____
One of its attorneys

Leonard S. Shifflett (ARDC #2587432)
Brendan O'Connor (ARDC #6276720)
Keith Allen (ARDC #6271854)
Quarles & Brady, LLP
500 W. Madison Street
Suite 3700
Chicago, IL 60661-2511
312-715-5000 – Telephone
312-715-5155 - Facsimile