554

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2702 | **DATE** | 5/12/2004 |
| **CASE TITLE** | Hugo Diaz vs. Prudential Insurance Company of America | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Motions for Summary Judgment

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Parties have filed cross-motions for summary judgment [8-1] [12-1] pursuant to Federal Rule of Civil Procedure 56. For the reasons stated on the attached Opinion and Order, Defendant's Motion for Summary Judgment [12-1] is GRANTED; Plaintiff's Motion for Summary Judgment [8-1] is DENIED. The Clerk shall enter judgment pursuant to Fed. R. Civ. P. 58 in favor of Defendant Prudential Insurance Company of America and against Plaintiff Hugo Diaz. (See attached.)

*Trial date set for 6/22/04 is stricken -* Charles R. Norgle

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | number of notices | | **Document Number** |
|---|---|---|---|---|---|---|---|
| | No notices required. | | | | MAY 1 3 2004 | | |
| | Notices mailed by judge's staff. | | | | date docketed | | |
| | Notified counsel by telephone. | | | | | | 22 |
| ✔ | Docketing to mail notices. | | | | 15 | | |
| ✔ | Mail AO 450 form. | | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | | |
| | | courtroom deputy's initials | 2004 MAY 13 PM 12: 34 CLERK, U.S. DISTRICT COURT | | date mailed notice | | |
| | | | Date/time received in central Clerk's Office | | mailing deputy initials | | |

HUGO DIAZ,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　)
　　　　　　　　　　　　　　　　　)　　Case No. 03 C 2702
　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　Judge Charles R. Norgle
PRUDENTIAL INSURANCE　　　　　)
COMPANY OF AMERICA,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)

DOCKETED

MAY 1 3 2004

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge.

The Parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, Defendant's Motion for Summary Judgment is GRANTED; Plaintiff's Motion for Summary Judgment is DENIED.

## I. BACKGROUND

Plaintiff Hugo Diaz worked as a computer programmer analyst for Bank One in Chicago, Illinois. As a benefit of Diaz's employment with Bank One, he was covered under a long-term disability policy ("LTD Plan") underwritten by Defendant Prudential Insurance Company of America ("Prudential"). Generally, the LTD Plan provides disability benefits to Bank One employees who are determined unable to perform the essential duties of their regular occupations due to injury or illness.

1



## A. Relevant Medical Facts

In February of 2000, Diaz began experiencing pain in his lower back. Initially, he underwent two epidural steroid injections, both of which provided no significant improvement of his pain. As Diaz continued to perform his duties with Bank One, he received three additional lumbar epidural steroid injections with fluoroscopy[1] on November 8, 2000, November 22, 2000, and June 13, 2001. These injections provided some relief of Diaz's pain; however, he continued to require pain medication after each treatment.

In January of 2002, Diaz ceased working and elected to have surgery on his lower back. Specifically, Diaz opted to undergo a lumbar fusion procedure which consisted of L5-S1 posterior lateral fusion with instrumentation and iliac crest bone grafting. The surgery was recommended by Howard An, M.D. ("Dr. An"), Diaz's treating physician, after discovering an annular tear at L5-S1. Dr. An performed the surgery on February 4, 2002.

Following the surgery, Diaz experienced varying levels of pain throughout his recovery. At Diaz's February 22, 2002 post-operative examination, Diaz reported no significant leg pain and ambulated well. Additionally, his physical exam showed no neurologic deficit in the bilateral lower extremities, and his x-rays showed satisfactory alignment with all hardware appearing to be in place. Notwithstanding these observations, Dr. An noted that Diaz continued to have significant back pain

---

[1]Fluoroscopy is a live x-ray that physicians use to help guide the needle during an epidural injection. See Pl.'s Local Rule 56.1 Statement of Material Facts, at 4 n.7 (citing www.spine-health.com/topics, last visited 7-15-03.

following surgery despite the use of Durgesic patches and Norco for pain control. Dr. An also noted that pre-operatively, Diaz was taking 80 mg of OxyContin[2] three or four times a day.

On March 22, 2002, Dr. An noted that Diaz was much improved following surgery; however, his medications now included Zanaflex, Norco, Kadian and Neurontin. Dr. An also noted that Diaz had good strength in his bilateral extremities and that his neurologic status remained intact. Diaz's x-rays showed good alignment with no indication of hardware movement. Dr. An concluded that Diaz was making satisfactory progress and planned to re-examine Diaz in two months with the possibility of considering his return to work.

On March 29, 2002, Diaz reported significant increased left groin pain, increased right leg pain and sleeplessness. Diaz also reported the sensation of hardware movement in his back. After Diaz requested a change in pain medication, Dr. An discontinued Diaz's use of Norco and prescribed Lortab and Ambien for pain control. Diaz was then advised to call Dr. An's office on April 1, 2002 to provide an update on his condition.

On April 1, 2002, Diaz reported increased right leg numbness, difficulty ambulating and increased anxiety. He also requested anxiety medication, for which Dr. An prescribed Valium. Furthermore, in response to Diaz's complaints of hardware movement, Dr. An reviewed x-rays taken on April 5, 2002. He concluded that the fusion was consolidating and the hardware was in place. Dr. An also expressed concern about the amount of pain medication Diaz required and encouraged him to begin physical therapy.

---

[2]OxyContin is a strong narcotic pain reliever similar to morphine. It is intended to relieve pain which is moderate to severe in intensity. See www.fda.gov/cder/drug/infopage/oxycontin, last visited 5-11-04.

On April 23, 2002, Diaz telephoned Dr. An's office to relate that he really did not have a large component of pain at that time. Aside from occasional achiness and soreness at the surgical site, he felt much better and did not regret having the surgery. Diaz also related that he continued to suffer from anxiety, depression and fear over losing his job, indicating that he decided to see a psychologist to help with these symptoms.

On April 30, 2002, Bank One requested that Dr. An complete a Health Care Provider Medical Certification ("Certification") with respect to Diaz's condition. The Certification requested clinical information to support Diaz's extended time off work. Dr. An completed the Certification on May 1, 2002 and returned it to Bank One. In the Certification, Dr. An stated that he would evaluate Diaz on May 24, 2002 to determine whether he can return to work.

Also on April 30, 2002, Diaz had his initial evaluation for physical therapy at Athletico Sports Medicine and Physical Therapy Center ("Athletico").[3] Physical Therapist Melissa Kidder reported that Diaz had bilateral lower extremity pain, back pain, decreased range of motion to the lower extremities, and weakness secondary to discogenic back pain. Kidder also noted that Diaz was unable to walk more than two blocks without pain. On a pain scale of 1/10, Diaz rated his back pain at a level of 4-5, denying any feelings of numbness or tingling at that time.

In May and June of 2002, Diaz saw Dr. An on two occasions. During both visits, Dr. An noted that Diaz's pain had improved from his preoperative status. Additionally, Dr. An observed that Diaz had residual leg pain going down the lower extremities with associated back pain on the

---

[3] The record indicates that Diaz had additional physical therapy sessions up until November 6, 2002. Throughout his course of treatment, Diaz's level of pain increased and his physical condition did not improve from that assessed in his initial evaluation. See Administrative Record (hereinafter "A.R.") at 153-54,161-62, 225-26, 227, 231, 236-37, 240-42, 247, 250-66.

left side. Dr. An also noted pain at the bone graft site, which he expected to improve with time. Further, Dr. An stated that Diaz's neurologic examination remained normal. After Diaz's June 4, 2002 visit, Dr. An concluded that Diaz will need an additional one month of physical therapy and is then expected to return to work with restrictions. Dr. An also advised Diaz to decrease his use of narcotics at that time.

On June 18, 2002, Sandeep Amin, M.D. ("Dr. Amin") of the Rush Pain Center ("Pain Center") provided an update on Diaz's progress to Dr. An. Dr. Amin noted that Diaz's pain was constant, occasionally sharp and awakens him from his sleep. Additionally, Dr. Amin opined that Diaz was chronically dependant on his opiate medication and in need of detoxification. Dr. Amin further opined that Diaz was on escalating doses of opiates and taking long-term OxyContin prior to the surgery.[4]

In July and August of 2002, Diaz returned for two additional follow-up visits with Dr. An. In essence, Dr. An determined that Diaz's pain had improved since his surgery; however, he was experiencing residual back pain and numbness in the left thigh. On August 2, 2002, Dr. An noted that Diaz was to be re-evaluated on September 6, 2002 to establish the possibility of returning to work with some restrictions.

On September 3, 2002, three days prior to his September 6, 2002 follow-up examination, Diaz presented himself to the emergency room at Rush Presbyterian St. Lukes Medical Center. Diaz complained of severe lower back pain, which he rated at 10 on a pain scale of 1/10. Upon admission, Diaz's blood pressure was 130/70. After an extensive physical examination, it was

_____

[4]Approximately one week later, Dr. An discovered some overlap of medications prescribed between his office and the Pain Center. As a result, Dr. An deferred further treatment of Diaz's pain control to Dr. Amin.

determined that with the exception of paraspinal tenderness around T11-L2 on Diaz's right side, all other responses were normal. For pain relief, Diaz was administered Toradol and morphine and given a prescription for Ultram and Norco.

On September 6, 2002, Diaz returned to Dr. An for a follow-up visit. Dr. An noted that Diaz reported significant low back pain in recent weeks. Diaz related that the pain was constant and worse with standing, bending and sitting. Dr. An also noted that Diaz had significant tenderness to palpation in the paraspinal muscles bilaterally at the L3-5 levels. In addition, Dr. An noted that the degenerative segment was correctly fused and that Diaz's pain was associated with soft tissues, including muscle ligaments. Based on these findings, Dr. An concluded that no further surgery was required. Furthermore, Dr. An stated: "I believe that [Diaz] remains disabled because of ongoing symptoms of back pain but I hope that his condition improves with time." A.R. at 177. Dr. An recommended a follow-up visit in three months to evaluate a possible return to work.

On December 13, 2002, Diaz returned to visit with Dr. An. During the examination, Diaz reported that the epidural steroid injection under fluoroscopy, which was administered by Dr. Amin on November 22, 2002, provided significant relief of his pain.[5] This relief came after conservative treatment in the form of trigger point injections and medications provided no significant improvement. Dr. An reported that neurologically, Diaz was at his baseline which was intact. Dr. An also stated that Diaz had mild palpable tenderness at the level above the fusion; however, x-rays showed that the hardware was in excellent position and an adequate posterolateral fusion mass had developed. Dr. An concluded that there was no indication for any surgical intervention.

---

[5] Diaz underwent similar treatments on December 19, 2002 and January 2, 2003 which provided similar relief.

On February 23, 2003, Diaz again was examined by Dr. An who noted significant tenderness to palpation at the L4-5 level and paraspinal muscles. Dr. An concluded that there were no neurologic deficits and further surgery was not recommended. Dr. An stated that because of Diaz's persistent symptoms of back pain, he was unable to return to work at that time. Dr. An attributed Diaz's pain to multiple sources, including muscles, scar tissue and soft tissue around the surgical area.

On February 26, 2003, Diaz was examined at the Pain Center. His blood pressure was 121/80 with a pulse of 86. At the same time, Diaz reported a pain level of 10 on a scale of 1/10.

## B. Prudential's Benefit Determinations

Prudential denied Diaz's application for long-term disability benefits on three occasions. On July 22, 2002, Diaz applied for benefits under the LTD Plan. In a letter dated August 27, 2002, Prudential informed Diaz that his initial claim had been disallowed. Upon review, Prudential concluded that "the available medical evidence does not support your reported inability to perform your own sedentary occupation with the ability to change positions at will." Def.'s LR 56.1 Statement of Material Facts, Ex. B, at 3.

On October 22, 2002, Diaz sought review of Prudential's August 27, 2002 decision to disallow benefits under the LTD Plan. On or about November 22, 2002, Diaz submitted additional medical records to Prudential. In a letter dated January 22, 2003, Prudential upheld its decision to disallow benefits under the LTD Plan, thereby denying Diaz's first appeal.

On February 4, 2003, Diaz filed a second appeal. In response, Prudential submitted Diaz's medical documentation to Gale Brown, Jr., M.D. ("Dr. Brown") for review and comment. On April 3, 2003, without having performed a physical examination of Diaz, Dr. Brown opined that Diaz's

ongoing symptoms of persistent severe and disabling pain were not supported by the clinical and diagnostic evidence related to Diaz's lumbar spine condition. Additionally, Dr. Brown concluded that the evidence did not support musculoskeletal or neurological impairment that would preclude Diaz from performing the essential duties of his own sedentary occupation on a full-time basis with allowance for position changes. Dr. Brown also noted that there were non-physical factors adversely impacting gainful employment, including his fear of losing his job, psychiatric issues and opiod dependancy. Diaz does not seek long-term disability benefits as a result of psychiatric issues or opiod dependancy. On April 16, 2003, Prudential upheld its decision to disallow benefits under the LTD Plan.

On April 22, 2003, upon denial of his final request for reconsideration, Diaz filed the instant action. Generally, Diaz's Complaint seeks an award of disability benefits under the LTD Plan pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Compl. ¶ 4. Both parties have filed motions for summary judgment which are fully briefed and now before the court.

## II. DISCUSSION

### A. Standard of Review - Motions for Summary Judgment

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Murphy v. ITT Technical Services, Inc., 176 F.3d 934, 936 (7th Cir. 1999); see also Shank v. William R. Hague,

Inc., 192 F.3d 675, 682 (7th Cir. 1999) (stating that a party opposing summary judgment must present "what evidence it has that would convince a trier of fact to accept its version of events"). A defendant is entitled to put the plaintiff to his proofs and demand a showing of the evidence. See, e.g., Navarro v. Fuji Heavy Industries, Ltd., 117 F.3d 1027, 1030 (7th Cir. 1997). If the plaintiff fails to come up with the required proof, the defendant is entitled to summary judgment. See id. It bears repeating that the plaintiff must present evidence, rather than speculation and conclusions without factual support. See Rand v. CF Industries, Inc., 42 F.3d 1139, 1146-47 (7th Cir. 1994).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Bombard v. Fort Wayne Newspapers, Inc., 92 F.2d 560, 562 (7th Cir. 1996). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the party opposing summary judgment. See Fed. R. Civ. P. 56(c); Perdomo v. Browner, 67 F.3d 140, 144 (7th Cir.1995). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); First Nat'l. Bank of Arizona v. Cities Service Co., 391 U.S. 253, 280 (1968); Wolf v. Buss (America) Inc., 77 F.3d 914, 922 (7th Cir. 1996). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994) (citing Anderson, 477 U.S. at 249-50; 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure: Civil § 2712, at 574-78 (2d ed. 1983)).

In this case, Diaz's only assertion is one for benefits under his ERISA plan. "A claim for benefits under an ERISA-governed plan 'is a matter of contract interpretation. When there are no triable issues of fact, we have held that contract interpretation is a subject particularly suited to disposition by summary judgement.'" Bechtold v. Physicians Health Plan of Northern Ind. Inc., 19 F.3d 322, 325 (7th Cir. 1994) (quoting Hickey v. A.E. Staley Mfg., 995 F.2d 1385, 1389 (7th Cir. 1993)).

## B. Standard of Review - Denial of Benefits Under ERISA

ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefit plans," Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90 (1983), and "to protect contractually defined benefits." Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 148 (1985); see generally 29 U.S.C. § 1001 (setting forth congressional findings and declarations of policy regarding ERISA). ERISA requires "a 'full and fair' assessment of claims and a clear communication to the claimant of the 'specified reasons' for benefit denial." Black & Decker Disability Plan v. Nord, 123 S.Ct. 1965, 1967 (2003). ERISA provides "a panoply of remedial devises" for participants and beneficiaries of benefits plans. Firestone Tire and Rubber Co. v. Brunch, 489 U.S. 101, 106 (1989) (citing Massachusetts Mutual Life Ins. Co., 473 U.S. at 146).

The Supreme Court held in Firestone that a "de novo standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest." Firestone, 489 U.S. at 115 (citing Restatement (Second) of Trust § 187, Comment d (1959)). Further, the Seventh Circuit has stated "[t]he [Firestone] case makes plenary review the default rule, that is, the rule to govern when the plan documents contain no indication of the scope of judicial review; and it is a natural and

modest extension of [Firestone], or perhaps merely a spelling out of an implication of it, to construe uncertain language concerning the scope of judicial review as favoring plenary review as well." Herzberger v. Standard Insurance Co., 205 F.3d 327, 330 (7th Cir. 2000). However "an ERISA plan can likewise specify that the administrator has discretion in interpreting or applying it . . . but the conferral of discretion is not to be assumed." Id. at 331. Discretion is only entitled when the language of the plan provides it. See id.; see also O'Reilly v. Hartford Life & Accident Ins. Co., 272 F.3d 955, 959 (7th Cir. 2001).

The Seventh Circuit has suggested "safe harbor" language that would assure that the administrator has sole discretion, but such language is not mandatory nor can it be considered magic words. See Herzberger, 205 F.3d at 331 (suggesting the following 'safe harbor' language: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them."). Rather, "in some cases the nature of the benefits or the conditions upon it will make reasonably clear that the plan administrator is to exercise discretion." Id. In others, the plan will contain language that, while not so clear as the suggested 'safe harbor' language, "indicates with the requisite of minimum clarity that a discretionary determination is envisaged." Id.; see also Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 379 (7th Cir. 1994) (determining that a plan's language need not contain an explicit grant of discretionary authority for a discretionary standard of review to apply). If the administrator has discretion, then the court reviews the administrator's decision from the perspective of an arbitrary and capricious standard. See Herzberger, 205 F.3d at 331-32.

In this case, the parties dispute whether the language of the LTD Plan provides Prudential with discretion to determine whether Diaz is entitled to disability benefits. As such, the court must

look to the language of the LTD Plan to determine the appropriate standard of review to apply in this case. See Militello v. Central States, Southeast and Southwest Areas Pension Fund, 360 F.3d 681, 685 (7th Cir. 2004); see also Ramsey v. Hercules Inc., 77 F.3d 199, 205 (7th Cir. 1996).

### 1. Plenary vs. Discretionary Review

Arguing which standard of review applies, both parties direct the court to the LTD Plan's definition of long-term disability. This section contains the following language in reference to defining a long-term disability:

**How Does Prudential Define Disability?**

You are disabled when Prudential determines that:

- you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

A.R. at 421 (emphasis in original). This language clearly indicates that Prudential determines whether or not an employee is disabled under the plan. However, this language, by itself, is not enough to confer a grant of discretionary authority. See Herzberger, 205 F.3d at 333 (holding that "the mere fact that the plan requires a determination of eligibility or entitlement by the plan administrator . . . does not give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary."). To confer discretionary authority, the plan language must adequately place the claimant on notice that his proof must satisfy the plan administrator's discretion. See Donato, 19 F.3d at 379. To do this, the Seventh

Circuit has held that the plan language must treat total disability as a condition which is to be assessed subjectively by the plan administrator. See Ramsey, 77 F.3d at 205. Here, because the factors Prudential must analyze to make its determination are arguably objective, rather than subjective, this language alone does not provide "the requisite minimum clarity that a discretionary determination is envisaged." See Herzberger, 205 F.3d at 333.

Nevertheless, the court's analysis does not stop here. The court must examine the entirety of the LTD plan to determine whether its language is sufficient to confer discretion on Prudential. In the section styled **"Long Term Disability Coverage - Claim Information,"** under the heading **"What Information is Needed as Proof of Your Claim?"** the plan states: "We may request that you send proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor." A.R. at 433 (emphasis in original). Unlike the section defining total disability, this section shows that the required proof necessary for making a claim will be assessed subjectively. The phrase "satisfactory to Prudential" modifies the phrase "proof of continuing disability," and it clearly demonstrates that any proof submitted upon a claim for benefits must meet specific requirements as subjectively determined by Prudential. Such language adequately places the claimant on notice that his proof must satisfy Prudential's discretionary authority. See Donato, 19 F.3d at 379 (holding that the language "all proof must be satisfactory to us" confers discretionary authority); see also Bali v. Blue Cross & Blue Shield Ass'n, 873 F.2d 1043, 1047 (7th Cir. 1989) (holding that the phrase "determined on the basis of medical evidence satisfactory to the Committee" results in a review under the arbitrary and capricious standard). As a result, the court will apply the arbitrary and capricious standard of review to Diaz's claim for disability benefits. See Donato, 19 F.3d at 380.

## 2. *The Arbitrary and Capricious Standard of Review*

"Under the arbitrary and capricious standard, determinations will be overturned by the court only when they are 'unreasonable, and not [when] merely incorrect.'" Herzberger, 205 F.3d at 329; see also James v. General Motors Corp., 230 F.3d 315, 317 (7th Cir. 2000) (stating a benefit determination will only be found arbitrary and capricious when "downright unreasonable"). To find that a decision was arbitrary and capricious, the court must first find that the decision-maker erred seriously in considering the evidence. Patterson v. Caterpillar, Inc., 70 F.3d 503, 505 (7th Cir. 1995). The court must ask whether the "decision was (1) without reason, (2) unsupported by substantial evidence, or (3) erroneous as a matter of law." Udoni v. Department Store Div. of Dayton Hudson Corp., No. 94 C 3577, 1996 WL 332717, at *2 (N.D. Ill. June 13, 1996) (citation omitted). The court does not ask whether the court, a jury, or a different plan administrator would or could have granted the benefits; any questions of judgment are left to the plan administrator. Patterson, 70 F.3d at 505 n3. When considering a claim under the arbitrary and capricious standard, the court may refer only to that evidence which was before the decision-maker at the time of the denial at issue. See Perlman v. Swiss Bank Corp., 195 F.3d 975, 982 (7th Cir. 2000) (defining the boundaries of permitted discovery where a plan beneficiary challenges the disability determination); see also Krawczyk v. Harnischfeger Corp., 41 F.3d 276, 279 (7th Cir. 1994). The court may not re-weigh the evidence before the decision-maker, it must only determine if the decision was reasonable. Chandler v. Underwriters Laboratories, 850 F. Supp. 728, 734 (N.D. Ill. 1994). Accordingly, the plan's decision "shall not be overturned . . . if it is possible to offer a reasoned explanation, based on the evidence, for the particular outcome." Exbom v. Central States, Southeast & Southwest Areas Health & Welfare Fund, 900 F.2d 1138, 1142 (7th Cir. 1990) (citations omitted). With these

principles in mind, the court will examine Diaz's claim for long-term disability benefits under the LTD Plan.

## C. Diaz's Claim for Disability Benefits Under the LTD Plan

Diaz's contends that Prudential erred in disallowing his claim because its decision was based on a selective review of the medical evidence. Primarily, Diaz's arguments suggest that Prudential ignored evidence showing high levels of pain, decreased flexibility and strength, gait deviations, and Diaz's inability to walk or sit for extended periods of time. See Pl.'s Reply to its Mot. for Summ. J., at 8. Diaz further argues that Prudential erred in disregarding Diaz's subjective reports of disabling pain after finding that the objective medical evidence did not fully support such a condition. See Pl.'s Mot. for Summ. J., at 6.

To support his position, Diaz relies on the Seventh Circuit's holding in Govindarajan v. FMC Corp., 932 F.2d 634 (7th Cir. 1991). In Govindarajan, the defendant's decision to terminate the plaintiff's disability benefits was based primarily upon a single medical report. 932 F.2d at 637. In this report, the plaintiff's treating physician indicated that the plaintiff could return to work. Id. In making its benefit determination, the defendant ignored subsequent reports in which the plaintiff's treating physician reversed his previous conclusion regarding the plaintiff's ability to return to work. Id. The defendant also ignored a contrary conclusion from the chief of spinal surgery at Loyola University Medical Center, who also examined the plaintiff. Id. Accepting the district court's finding that the defendant failed to review the entire medical file in assessing the plaintiff's claim, the court held that such a selective review of the evidence, coupled with the completely erroneous assertion that there was no physical cause for the subjective symptoms of pain, renders the defendant's decision arbitrary and capricious. Id.

15

After reviewing Prudential's decisions disallowing Diaz's claim for disability benefits, the court finds that Prudential's determination was not based on a selective review of the medical evidence. The record shows that Prudential reviewed the medical reports from Dr. An, Dr. Amin and Athletico. See Def.'s Statement of Material Facts, Ex. B. at 3; A.R. at 312, 319. Unlike the plan administrator in Govindaragan, Prudential did not base its decision on a single report from Diaz's treating physician. Instead, Prudential relied on all reports submitted by Dr. An, while commenting on most of them. Specifically, Prudential's decisions refer to Dr. An's reports dated April 23, 2002, May 10, 2002, June 4, 2002, July 19, 2002, August 2, 2002, and September 6, 2002. See id. Further, prior to ruling on Diaz's second request for reconsideration, Prudential acknowledged its receipt of additional reports from Dr. An. A.R. at 319. While Prudential's decisions focus mainly on the medical evidence contained in Dr. An's reports, the court is also satisfied that Prudential carefully considered the evidence submitted by both Dr. Amin and Athletico, much of which highlights Diaz's subjective reports of severe back pain.

In essence, Prudential concluded that Diaz's surgery was successful despite his reports of severe continuing back pain. For example, in its initial denial, Prudential states:

> Medical records reveal that diagnostically and structurally, you have done well with regard to your lumbar fusion. X-rays performed reveal that the fusion is progressing and alignment is normal. The most recent Ct scan performed on July 31, 2002, due to continued pain and weakness, showed a normal study.

Def.'s Statement of Material Facts, Ex. B. at 3. This conclusion was reiterated in response to both of Diaz's requests for reconsideration. See A.R. at 312; see also A.R. at 320. Additionally, relying on its medical consultant in response to Diaz's second request for reconsideration, Prudential states:

> Mr. Diaz's ongoing symptoms of persistent severe and disabling pain are not supported by the clinical and diagnostic evidence related to Mr. Diaz' [sic] lumbar spine condition. Dr. Brown also notes that Mr. Diaz' [sic] post-operative x-rays have

16

demonstrated a solid lumbar fusion, satisfactory alignment and positioning of hardware. Further, the diagnostic studies reveal no evidence of complications, such as loosening of hardware or neurological encroachment. Dr. Brown indicates that Mr. Diaz's post operative physical and neurological examinations have been normal. Further, the medical evidence does not reveal a musculoskeletal impairment such as spasm, instability, range of motion deficits or positive nerve root tension signs. Dr. Brown indicates that Mr. Diaz' [sic] symptoms of lower extremity, numbness and pain, along with his reports of severe low back pain do not correlate with the clinical or diagnostic evidence.

A.R. at 320. Thus, Prudential acknowledged that Diaz believes he is in severe pain at times. However, ultimately it concluded that the available clinical or diagnostic medical evidence does not support plaintiff's self-reported symptoms of severe low back pain. Prudential also acknowledged that although Diaz may continue to experience some back pain and require additional treatment, his condition does not support an impairment that would prevent him from performing his sedentary duties. See A.R. at 320. Further, Prudential reasoned that Diaz's position as a computer programmer analyst allowed for reasonable limitations and restrictions, such as no frequent or constant bending or twisting at waist level, no heavy lifting, and the ability to change positions every 15-30 minutes as needed for comfort. See id. Based on these findings, the court is satisfied that Prudential considered all of the available medical evidence before making its determination.

Additionally, Prudential did not disregard Diaz's subjective reports of disabling pain. The Seventh Circuit has held that a plan administrator cannot disregard the plaintiff's subjective reports of disabling pain, particularly when the pain is of the type that cannot be detected by objective laboratory tests. Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 919 (7th Cir. 2003) (finding that plaintiff who suffered from fibromyalgia was totally disabled). In Hawkins, the plan administrator's decision gave little weight to the plaintiff's subjective reports of pain simply because the objective medical evidence did not support them. Id. Applying the arbitrary and

17

capricious standard of review, the court rejected the plan administrator's determination. Id. Thus, Hawkins stands for the proposition that a plan administrator's decision to disregard the plaintiff's subjective reports of pain, solely because the objective medical evidence does not support them, is arbitrary and capricious. Id.

In this case, the record clearly shows that Prudential considered Diaz's subjective reports of pain prior to making its determination. Unlike the plan administrator in Hawkins, Prudential's decision to discount Diaz's subjective reports of pain was based on numerous factors, not just the lack of supporting objective medical evidence. For example, in the section of Dr. Brown's report focusing on the non-physical factors adversely impacting Diaz's gainful employment, Dr. Brown outlines numerous justifications which suggest an exaggerated level of pain. See A.R. at 034. These justifications include Diaz's fear of losing his job; psychiatric issues, including anxiety and depression; the lack of appropriate physiological responses to Diaz's reports of severe pain, i.e., signs of hypertension and tachycardia; and Diaz's strong dependency on opioids. See id. Additionally, the record shows that Diaz's symptoms of pain tended to increase each time he was to be re-evaluated for return to work. This result is contrary to Dr. An's assessment of the objective medical evidence, and his statements which indicate that he is optimistic about Diaz's return to work. Thus, in addition to finding that Diaz's ongoing symptoms of severe back pain are not supported by the clinical and diagnostic evidence related to Diaz's lumbar spine condition, Prudential had reason to find that these non-physical factors exacerbated Diaz's belief of severe pain. Such a finding is clearly reasonable, and Diaz has failed to show that Prudential's decision was arbitrary and capricious.

Finally, Diaz makes two additional arguments in support of his claim for benefits. First, Diaz

argues that the Social Security Administration's ("SSA") finding of disability, issued on July 24,

2003, confirms Prudential's mistaken conclusion in this case. Although the court may consider such

evidence as probative, see Ladd v. ITT Corp., 148 F.3d 753, 754 (7th Cir. 1998), it certainly is not

binding. See Donato, 19 F.3d at 380. The SSA's determination is even less probative when, as in

this case, it was not before the plan administrator at the time of the denial. See id. (holding that the

plan administrator is only bound to consider what evidence and information it had before it at the

time of decision). Further, the criteria used by the SSA in determining disability differs from that

which is outlined in the LTD Plan. See Nord, 123 S.Ct. at 1971 (noting the difference between the

Social Security Act and ERISA plans). Nevertheless even if the criteria were the same, Diaz has not

met his burden of establishing that this alone makes Prudential's decision arbitrary and capricious.

It is not unacceptable for individual fact-finders to view identical evidence in different ways and for

neither of them to be vulnerable to attack under the arbitrary and capricious standard. To suggest

that Prudential could not reach an alternate opinion based upon the same evidence is in itself

unreasonable.

Second, Diaz argues that Prudential should have accorded more weight to the reports

submitted by Diaz's treating physicians than to the one submitted by Dr. Brown, a non-examining

physician. In Nord, the Supreme Court rejected this very argument. See id. The Court held that

although plan administrators may not arbitrarily refuse to credit reliable opinions of a claimant's

treating physician, ERISA does not require plan administrators to accord special deference to those

opinions. See id. Here, Prudential decided to reject Dr. An's conclusion that Diaz was disabled after

evaluating the entirety of his reports. By accepting the contrary opinion of Dr. Brown, a non-

19

examining physician, Prudential did not err in making its final determination. <u>See id.</u>  Therefore, Prudential's decision to deny Diaz's claim for long-term disability benefits was not arbitrary and capricious.

### III. CONCLUSION

For the foregoing reasons,  Defendant's Motion for Summary Judgment is GRANTED; Plaintiff's Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

ENTER:

CHARLES R. NORGLE, Judge
United States District Court

DATED: _____5-12-04_____