IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUGO DIAZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 03 C 2702 |
| | ) |
| PRUDENTIAL INSURANCE | ) HONORABLE CHARLES R. NORGLE |
| COMPANY of AMERICA, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court is Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, Defendant's Motion for Summary Judgment is granted.

**I. BACKGROUND**[1]

**A. Facts**

This case arises out of the denial of long term benefits by Defendant Prudential Insurance Company of America ("Prudential") to Plaintiff Hugo Diaz ("Diaz"). Diaz worked as a computer programer at Bank One in Chicago, Illinois from October 1998 through February 2004. In February 2000, Diaz initially received two epidural steroid injections for lower back pain; however this provided no significant improvements. Months later, Diaz received three more

---

[1] The court takes the undisputed facts from the parties' Local Rule 56.1 Statements, and notes disputed facts within the text.

1

epidural steroid injections on November 8 and 22, 2000, and June 13, 2001.

As a benefit of Diaz's employment with Bank One, he was covered under a long-term disability policy ("LTD Plan") underwritten by Prudential. The LTD Plan provides disability benefits to Bank One employees who are determined unable to perform the essential duties of their regular occupations due to injury or illness.

On February 4, 2002, Diaz underwent what is called an L5-S1 posterolateral spinal fusion with hardware implantation surgery at Rush-Presbyterian St. Luke's Medical Center ("Rush"). Dr. Howard An ("An") performed the surgery, after discovering a tear in part of Diaz's spine. On February 22, 2002, Diaz had his first post-operative examination with Dr. An. At that examination, he reported no significant leg pain and was able to ambulate well. Dr. An noted that Diaz had no neurological deficit in his legs, and his x-rays showed that the hardware was in place and that his spinal alignment was satisfactory.

On March 22, 2002, Dr. An noted that Diaz had good strength of the bilateral lower extremities, his neurologic status remained intact, his x-rays showed excellent alignment of the screws bilaterally, and that there was an early sign of fusion with no significant loosening of the hardware. Dr. An found that Diaz had made satisfactory progress following the operation, and that he would see Diaz in two months to determine whether he could return to work.

Then, on March 29, 2002, Diaz returned to see Dr. An and complained of left groin and right leg pain, and that he felt the hardware in his back had moved. Dr. An prescribed the drugs Lortab and Ambien to control Diaz's pain. Dr. An further instructed Diaz to call his office on April 1, 2002 to update Dr. An on his condition.

On April 1, 2002, Diaz reported to Dr. An that he felt "anxiety," which Diaz attributed to

2

the feeling of hardware movement in his back, as well as an increased numbness in his right leg. Diaz requested medication for his anxiety, and as a result, Dr. An prescribed Valium. Dr. An also reviewed Diaz's post-operative films and concluded that there was no hardware movement in Diaz's back. Dr. An told Diaz that he did not need a follow-up appointment that week because a change in treatment plan was not necessary.

Then, on April 5, 2002, Diaz again complained to Dr. An of hardware movement in his back. Dr. An again reviewed the x-rays and assured Diaz that his fusion was consolidating nicely and that the hardware was in its proper place. Additionally, Dr. An expressed some concern about that amount of pain medication Diaz was on and encouraged him to begin physical therapy.

At Diaz's April 30, 2002 physical therapy session, he reported bilateral calf and thigh pain, and rated his back pain between a 4 and a 5 on a scale of 1 to 10. Diaz also stated that he could sit for approximately two hours, and walk more than two blocks. Also on April 30, 2002, Dr. An provided a Health Care Medical Certification to Bank One, stating that Diaz would be evaluated on May 24, 2002 to determine his ability to return to work.

On May 10, 2002, Diaz visited Dr. An and complained of residual leg and back pain. Dr. An noted that Diaz was doing better than before the surgery with relief from his back and leg pain, and that Diaz's x-rays showed a good healing process with the screws in his back in good placement. Diaz also told Dr. An that he needed psychiatric help for depression and possibly a detoxification program. Dr. An referred Diaz to Dr. Sandeep Amin ("Amin") for his problem with pain medication.

On June 4, 2002, Diaz told Dr. An that he could walk 4 blocks, and that he thought his pain was much better than before the surgery. After conducting a physical examination, Dr. An

3

noted that Diaz's neurological status was intact, except for a slight decreased sensation in his left thigh. Additionally, Diaz's x-rays showed good incorporation of the fusion site, and the hardware was in good placement. Based on his observations, Dr. An concluded that Diaz was doing relatively well and could return to work with some restrictions after another month of physical therapy. Dr. An also instructed Diaz to scale back his narcotics use. Two days later, on June 6, Diaz called Dr. An complaining of pain and hardware movement. Dr. An informed Diaz that the hardware had not moved.

Then, on June 18, 2002, Diaz saw Dr. Amin at Rush Pain Center. Dr. Amin observed that Diaz's vitals were stable, yet concluded that Diaz was chronically dependant on opiate medication and in need of detoxification. Dr. Amin decreased Diaz's dosages of the drugs Kadian and Norco, and recommended a follow up with a detoxification doctor.

During his June 27, 2002 physical therapy session, Diaz complained of constant lower back pain, which he rated as a 7 on a scale of 1 to 10. He further stated that he could walk 3 or 4 blocks, and sit for 15 minutes at a time. Diaz's physical therapist noted an increased lower leg flexibility and strength in his right leg.

At Diaz's July 19, 2002 appointment with Dr. An, he reported pain in his lower back and slight numbness in his thigh. Again, Dr. An noted that Diaz's x-rays were normal and that the hardware fusion was progressing in a satisfactory manner. However, Diaz continued to report pain. As a result, Dr. An ordered a CT scan in order to rule out any disc problems. On August 2, 2002, Dr. An told Diaz that the CT scan did not reveal a herniated disc or any problems with the implant. Dr. An said that Diaz could return to work within a month.

On July 22, 2002, Diaz submitted a claim to Prudential for LTD benefits. Plaintiff

4

alleges that in his Employee Statement that his position as a computer programmer analyst involved 90% sedentary activity. In the attached "Attending Physician's Statement," Dr. An stated that Diaz suffered chronic pain with weakness in his lower legs and was unable to sit for longer than 20 minutes or walk more than 5 blocks. Then, on August 19, 2002, Paula Arbadji ("Arbadji"), an in-house nurse at Prudential, reviewed Diaz's file and determined that he could have performed his duties starting on August 5, 2002.

On August 27, 2002, Prudential, relying on Arbadji's opinion, denied Diaz's claim for LTD benefits. Upon review, Prudential concluded that "the available medical evidence does not support your reported inability to perform your own sedentary occupation with the ability to change positions at will."

Then, on September 3, 2002, three days before his appointment with Dr. An, to evaluate whether he could return to work, Diaz brought himself to the emergency room, complaining of lower back pain. The attending physician noticed that Diaz was able to ambulate normally, and that his back, neurological, and extremity exams were all normal. During Diaz's September 5, 2002 physical therapy session, he told the therapist that he could walk 5 to 6 blocks daily, and that his stair climbing abilities had improved. However, Diaz said he experienced severe lumbar pain, and that his pain was rated at a 9. As a result, the physical therapist recommended another course of therapy.

On September 6, 2002, Diaz saw Dr. An and complained of what Diaz called "uncontrollable" back pain. Diaz also said he felt tenderness when he was examined by Dr. An. Once again, the x-rays contradicted Diaz's statements, and showed good fusion with the hardware and Diaz's spine. Dr. An concluded that Diaz remained disabled because of his

5

ongoing symptoms of back pain.

Then, on October 22, 2002, Diaz submitted his first appeal to Prudential for the denial of his LTD benefits. On October 29, 2002, Dr. An completed a form in which he assessed Diaz's ability to complete work-related activities. In this form, Dr. An stated that Diaz could lift and carry less than 10 pounds, and stand and walk for less than 2 hours, sit for 15 minutes before changing positions, and stand for 15 minutes before changing positions.

Diaz had another physical therapy session on November 6, 2002. At this session, he rated his pain at a 7 to 9.5. However, Diaz said he could walk between 10 to 11 blocks daily, but sitting for more than 15 minutes, or standing for more than 20 minutes caused him pain. Additionally, the physical therapist noted bilateral lumbar and thoracic paraspinal spasm in Diaz's back.

On December 13, 2002, Diaz visited Dr. An. During the examination, Diaz reported that the epidural steroid injection he received on November 22, 2002 from Dr. Amin had provided significant relief to his pain. Dr. An stated that Diaz's incision was well-healed, that he exhibited mild palpable tenderness above the fusion site, he was intact neurologically, and was able to walk heel to toe. Dr. An further stated that he told Diaz that he continued to improve, and no follow up visit was necessary. However, Diaz returned to Dr. Amin for a second epidural injection, on December 19, 2002, and again on January 2, 2003 for a third injection.

On January 9, 2003, Dr. Patrick Foye ("Foye"), a consultant for Prudential specializing in physical medicine and rehabilitation, reviewed Diaz's file. Foye determined that Diaz could perform his sedentary occupation, retroactive to August 5, 2002. Then, on January 22, 2003, Prudential, relying on Dr. Foye's and Nurse Arbadji's opinions, denied Diaz's first appeal.

After the denial, on January 24, 2003, Diaz saw Dr. An and complained of pain in his lower lumbar region. When Dr. An conducted a physical examination, Diaz reported tenderness around the incision area. Dr. An noted that the x-rays showed a solid fusion along with good placement of the hardware. It was Dr. An's professional opinion that no further surgery was needed.

Then, on February 23, 2003, Diaz saw Dr. An and complained of significant back pain. Dr. An noticed tenderness in Diaz's paraspinal muscles, although his neurological status remained in tact. Dr. An concluded that Diaz could not return to work due to his continued pain and noted that Diaz had decided against a spinal cord stimulator treatment.

On March 25, 2003, Prudential forwarded Diaz's file to Dr. Gale Brown, Jr. ("Brown"), an independent medical expert specializing in physical medicine and rehabilitation. Dr. Brown reviewed Diaz's job description, statements from Drs. An and Amin, medical records from Rush Hospital, various diagnostic test reports, physical therapy notes from April 30, 2002 through February 26, 2003, and emergency room records from September 3, 2002. Based upon these documents, Dr. Brown concluded that the medical evidence did not support a musculoskeletal or neurological impairment that would preclude Diaz from performing his duties on a full time basis. Furthermore, Dr. Brown noted that Diaz's ongoing complaints of pain were not supported by any diagnostic evidence. For example, Dr. Brown found that the postoperative x-rays demonstrated solid lumbar fusion, satisfactory positioning of hardware, and no evidence of complications.

Finally, on April 16, 2003, Prudential denied Diaz's second appeal for LTD Plan benefits.

## B. Procedural History

On April 22, 2003, Diaz filed his Complaint, seeking an award of disability benefits under the LTD Plan pursuant to §502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). On May 12, 2004, the court granted Prudential's Motion for Summary Judgment, and entered judgment pursuant to Federal Rule of Civil Procedure 58 in favor of Prudential. On October 12, 2004, the United States Court of Appeals for the Seventh Circuit reversed and remanded the case to the district court. Diaz v. Prudential Ins. Co., 424 F.3d 635 (7th Cir. 2005).

Then, on May 25, 2006, the parties filed cross motions for summary judgment. Each party filed its respective Response on June 30, 2006, and Replies were filed on July 18, 2006. Prudential's Motion for Summary Judgment is fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

#### *1. Motions for Summary Judgment*

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Szymanski v. Rite-Way Lawn Maintenance Co., 231 F.3d 360, 364 (7th Cir. 2000); see also Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002).

8

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. See FED. R. CIV. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

When a party moves for summary judgment, the court must view the record and all inferences in a light most favorable to the non-moving party. Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F.3d 814, 821 (7th Cir. 2000). However, the inferences construed in the non-moving party's favor must be drawn from specific facts identified in the record that support that party's position. See Szymanski, 231 F.3d at 364. Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d. 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

### 2. *Denial of Benefits under ERISA*

ERISA was enacted "to promote the interests of employees and their beneficiaries in employee benefits plans," Shaw v. Delta Airlines, Inc., 463 U.S. 85, 90 (1983), and "to protect

9

contractually defined benefits." Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 138 (1985), see 29 U.S.C. § 1001 (setting forth congressional findings and declarations of policy regarding ERISA). ERISA requires "a 'full and fair' assessment of claims and a clear communication to the claimant of the 'specified reasons' for benefit denial." Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003). ERISA provides a "panoply of remedial devices" for participants and beneficiaries of benefits plans. Firestone Tire and Rubber Co. v. Brunch, 489 U.S. 101, 106 (1989) (citing Massachusetts Mutual Life Ins. Co., 473 U.S. at 146).

Furthermore, "the Supreme court has held that 'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Diaz, 424 F.3d at 636-37 (quoting Firestone Tire and Rubber Co., 489 U.S. at 115). Put another way, plans without discretion are reviewed under the *de novo* standard. Id. at 639.

## B. Prudential's Denial of Diaz's LTD Benefits

### *1. No discretion for Plan Administrator*

Here, the critical question is "whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretations, and content of the rules in each case." Diaz, 424 F.3d at 639 (citing Herzberger v. Standard Ins. Co., 205 F.3d 327, 330 (7th Cir. 2000)).

Prudential's LTD Plan "requires 'proof of continuing disability, satisfactory to Prudential, indicating that [the claimant is] under the regular care of a doctor.'" Id. The language in the plan "does not alert the plan participant to the possibility that Prudential has the power to re-define the

10

entire concept of disability, or regularity of physician care, on a case-by-case basis." Id. Instead, the plan suggests that "the plan participant must submit reliable proof of two things: continuing disability and treatment by a doctor." Id. Plainly put, "under Prudential's Plan, the only discretion reserved is the inevitable prerogative to determine what forms of proof must be submitted with a claim-something that an administrator in even the most tightly restricted plan would have to do." Id. As a result, the plan administrator must make a judgment under the confines of pre-set standards, and Diaz's application must be reviewed under the *de novo* standard. Id. at 640.

### 2. *Under the De Novo Standard, Prudential properly denied Diaz LTD Plan Benefits*

Under a *de novo* review, the court finds that Prudential was correct to deny Diaz any benefits under the LTD Plan. The court notes that when Prudential conducted its review of Diaz's application, it employed a different medical expert to review each stage of the claims process. Initially, Prudential relied on Nurse Arbadji's opinion in order to deny Diaz on his initial application. In its denial letter, Prudential cited Dr. An's report of April 23, 2002, in which he stated that Diaz did not have a large amount of pain, and was in general high spirits. Additionally, Arbadji noted that in Dr. An's May 10, 2002 report, Dr. An found that Diaz's x-rays demonstrated a positive healing process with the spine, and that the screws were in good placement. Moreover, Dr. An's June 4, 2002 report noted that Diaz could return to work with restrictions after a month of physical therapy. Lastly, Diaz's July 31, 2002 CT scan showed a normal progression of his spine after the surgery, which confirmed Dr. An's opinion that Diaz's operation was healing in a satisfactory manner.

11

Furthermore, Prudential relied on Dr. Foye's opinion after Diaz submitted his first appeal. In reliance of Dr. Foye's expert opinion, Prudential cited Dr. An's July 19, 2002 report in which he noted a normal neurological exam, and that Diaz's back pain had subsided after the surgery, as justification for its denial. Prudential also relied on Dr. Foye's analysis of Dr. An's August 2, 2002 report, in which Dr. An observed that Diaz's fusion was stable, there was no indication of disc herniation, and that Diaz had improved since the surgery.

After Diaz submitted his second appeal, Prudential consulted Dr. Brown, and independent medical expert. Dr. Brown reviewed Diaz's complete file, including all of the doctor reports, medical records, physical therapy notes, and emergency room records. Dr. Brown reasoned that she did not give much significance to the physical therapist's finding of paralumbar spasms, in light of the totally of the evidence. Specifically, Dr. Brown stated that

> Those reports have to be weighed in terms of their overall validity. At a time when Mr. Diaz's doctors are documenting totally normal neurological exams, normal strength, the therapist was documenting three, three plus out of five strength on the manual muscle testing. That would place Mr. Diaz in the need of an assistive device if he, in fact, had that degree of weakness and none of the doctors documented positive nerve root tension signs. There was no diagnostic evidence suggesting that he had nerve root compression. So, I think you have to take the physical therapist's documentation in light of the overall medical evidence.

Def. Stat. of Mat. Facts, ¶ 65, Ex. 2 at 73-74.

Lastly, Dr. Brown noted that Diaz's sedentary job did not require him to lift heavy objects or perform any tasks that required repetitive bending and twisting. According to Dr. Brown, the expected recovery period for a patient to perform a sedentary occupation following a single level fusion was three months. However, based on Diaz's own case and the overall diagnostic evidence, Dr. Brown allowed up to six months for his recovery.

12

In her conclusion, Dr. Brown stated that Diaz's ongoing complaints of lower back pain were not supported by any of the medical evidence contained in the record. None of the x-rays, medical reports, or physical therapist notes supported Diaz's claim of continued back pain. Plainly put, there is nothing that would prohibit Diaz from performing his duties at his job at Bank One on full time basis beyond August 5, 2002. Because Diaz is unable to submit reliable proof of both a "continuing disability and treatment by a doctor," summary judgment must be granted in favor of Prudential. See Diaz, 424 F.3d at 639.

Lastly, the court notes that Diaz does not submit any evidence in the form of his own expert medical witness to rebut Prudential's assertions. Diaz does include notes and letters written by Dr. An to Bank One. However, there are no depositions that contradict any of the evidence submitted by Prudential. Therefore, Diaz does not offer any evidence to demonstrate that his lower back pain is supported by a medical diagnosis. Instead, he relies on the tests administered by the physical therapist, which, as Dr. Brown stated in her professional medical opinion, cannot be reconciled with the clinical and diagnostic evidence such as x-rays and physical examinations. As a result, Diaz cannot create a genuine issue of material fact that he is entitled to LTD Plan benefits from Prudential. See E.E.O.C. v. Target Corp., 460 F.3d 946, 954 (7th Cir. 2006) ("Summary judgment should only be granted if the record shows that there is no genuine issue of material fact.").

## III. CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge

United States District Court

DATED: 10-4-06